**NOTICE:   SLIP OPINION**
**(not the court's final written decision)**

The opinion that begins on the next page is a slip opinion.  Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision.  Slip opinions can be changed by subsequent court orders.  For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion.  Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports.  An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.**  The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports.  Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

**FILE**

IN CLERK'S OFFICE
SUPREME COURT, STATE OF WASHINGTON
JANUARY 28, 2021

*González, C.J.*
CHIEF JUSTICE

THIS OPINION WAS FILED
FOR RECORD AT 8 A.M. ON
JANUARY 28, 2021

*Susan L. Carlson*

SUSAN L. CARLSON
SUPREME COURT CLERK

## IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 98066-7 |
| Respondent, | ) | |
| | ) | |
| v. | ) | En Banc |
| | ) | |
| CORY PRATT, | ) | |
| | ) | Filed: January 28, 2021 |
| Petitioner. | ) | |
| _____ | ) | |

YU, J.— This case concerns the eligibility criteria of the special sex offender sentencing alternative (SSOSA), which requires offenders to have "an established relationship with, or connection to, the victim such that the sole connection with the victim was not the commission of the crime." RCW 9.94A.670(2)(e). We are asked to determine whether an offender is eligible for SSOSA where he and the victim shared a family member in common, but did not have a direct relationship. We conclude that Cory Pratt was not "connected" to his

*State v. Pratt*, No. 98066-7

victim as required by RCW 9.94A.670(2)(e) and is therefore ineligible for a

SSOSA sentence. We affirm the Court of Appeals and remand the case to the trial

court for resentencing.

BACKGROUND

In July 2016, Pratt and his daughter attended his cousin's birthday party.

Several young girls spent the night after the party, including M.B., the 10-year-old

daughter of Pratt's aunt's stepsister. Pratt slept in a backyard tent with the girls.

The next day, M.B. told her grandmother and parents that Pratt had touched her in

the tent. M.B. testified that Pratt touched her arm, her lower back, and rubbed her

crotch. 2 Verbatim Report of Proceedings (VRP) (Oct. 2, 2017) at 152-56. M.B.'s

mother contacted police. In October 2016, Pratt was charged with one count of

child molestation in the first degree. After a two-day bench trial, Pratt was found

guilty of the charge.

Pratt requested a SSOSA sentence pursuant to RCW 9.94A.670. The State

objected, arguing that Pratt was ineligible because he did not have an "established

relationship" with M.B. as required by the statute:

> Here, [Pratt] had only met this victim a few hours before the actual
> crime took place . . . maybe just over 12 hours after he had met her.
>
> So there clearly is not an established relationship.

*State v. Pratt*, No. 98066-7

3 VRP (Jan. 5, 2018) at 349. Pratt countered that he was eligible for SSOSA

because his connection with M.B. was "easily established" through "familial ties."

*Id.* at 353. Pratt elaborated:

> [T]his is not a situation where he just showed up at a bus stop to grab the kid
> or abducted the kid, and that's the sole connection.
>
> I would argue that the sleepover itself is sufficient to satisfy the statute
> in that he was there as, you know, a helping adult at this party with his own
> daughter there, so there's additional connection to this child other than the
> crime.

*Id.* at 354.

The court agreed with Pratt:

> [I]t's very close, tenuous, but there is some connection. They may not have
> really met, but there is a connection. They knew—he knew of the child. He
> knew of the parents. There is some time there spent. This was not brought
> together where he sought out the victim for the purposes of committing the
> act.

*Id.* at 360.[1] The court sentenced Pratt according to SSOSA, reducing his sentence

from 57 months of confinement to 12 months.

The State appealed Pratt's sentence. In a published split opinion, the Court

of Appeals reversed the trial court, concluding that Pratt was ineligible for SSOSA.

---

[1] The court's written findings in support of SSOSA noted, "(1) the Victim's family is related through marriage with the Defendant's family, (2) the Defendant knew of the Victim, and had been acquainted with the Victim's family, (3) the Defendant and the Victim were both invitees to a sleepover party for their mutual family member, to wit: the Defendant's uncle's daughter, who is also the victim's cousin, and (4) that the Victim and Defendant had contact during the course of said party other than the actions that constitute the crime herein." Clerk's Papers at 99.

3

*State v. Pratt*, 11 Wn. App. 2d 450, 454 P.3d 875 (2019). Pratt filed a petition for

review, which we granted. 195 Wn.2d 1023 (2020).

ANALYSIS

Once a defendant has been convicted of a sex offense, the trial court has the

discretion to impose a SSOSA sentence. *State v. Osman*, 157 Wn.2d 474, 482, 139

P.3d 334 (2006). However, in order to be eligible for SSOSA, an offender must

meet the statutory criteria. *John Doe G v. Dep't of Corr.*, 190 Wn.2d 185, 192,

410 P.3d 1156 (2018); RCW 9.94A.670(2). As SSOSA eligibility is a question of

statutory interpretation, our review is de novo. *State v. Petterson*, 190 Wn.2d 92,

98, 409 P.3d 187 (2018).

Pratt's eligibility for SSOSA turns on whether he meets the requirement set

forth in RCW 9.94A.670(2)(e):

> The offender had an established relationship with, or connection to, the
> victim such that the sole connection with the victim was not the commission
> of the crime.

At trial, Pratt testified that he had little interaction with M.B., at most

handing her a marshmallow skewer and asking her name. But Pratt contends that

because there was a familial connection between Pratt's family and M.B.'s family,

his crime was not the "sole connection" to M.B. The State maintains that Pratt is

ineligible for SSOSA because the legislature did not intend SSOSA to apply to

4

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*State v. Pratt*, No. 98066-7

offenders like Pratt, who did not have any recognized relationship with their victim prior to the molestation.

We agree with the State and affirm the decision of the Court of Appeals.

Our primary duty in statutory interpretation is to ascertain and carry out the legislature's intent. *State v. Bigsby*, 189 Wn.2d 210, 216, 399 P.3d 540 (2017). We first examine a statute's plain meaning by construing the words of the statute itself and giving effect to that plain meaning. *State v. Hirschfelder*, 170 Wn.2d 536, 543, 242 P.3d 876 (2010). To determine the plain meaning, we review the text and "'the context of the statute in which that provision is found, related provisions, and the statutory scheme as a whole.'" *State v. Ervin*, 169 Wn.2d 815, 820, 239 P.3d 354 (2010) (quoting *State v. Jacobs*, 154 Wn.2d 596, 600, 115 P.3d 281 (2005)). "If after this inquiry the statute is susceptible to more than one reasonable interpretation, it is ambiguous." *State v. Jones*, 172 Wn.2d 236, 242, 257 P.3d 616 (2011). We may then turn to statutory construction, relevant case law, and legislative history to discern legislative intent. *Id.*

It is unclear from the plain meaning of RCW 9.94A.670(2)(e) what degree of association is required between an offender and his or her victim. The first clause of the statute, "[t]he offender had an established relationship with, or connection to, the victim," suggests a familiarity between offender and victim that existed prior to the sexual offense. But the second clause of the statute, "such that

5

the sole connection with the victim was not the commission of the crime," taken literally, seems to widen the scope of possible associations to any two people with some contact prior to the sexual offense.

These competing clauses resulted in a split decision in the Court of Appeals. The majority emphasized the first clause, holding that the word "established" modified both "relationship" and "connection," and that Pratt's minimal contacts with M.B. during the party—giving M.B. a marshmallow skewer and asking her name—were not sufficient to qualify as an established relationship or connection. *Pratt*, 11 Wn. App. 2d at 459-460. The dissent, however, focused on the broader language in the second clause, interpreting the "sole connection" to mean *any connection* outside of the assault:

> Therefore, the real question is not whether the connection between the offender and the victim rose to a certain level. The question is whether the *sole connection* between the offender and the victim was the commission of the crime.

*Pratt,* 11 Wn. App. 2d at 465 (Maxa, C.J., dissenting).

RCW 9.94A.670(2)(e)'s first and second clauses do appear to be at odds. But "'[s]tatutes must be interpreted and construed so that all the language used is given effect, with no portion rendered meaningless or superfluous.'" *State v. Roggenkamp*, 153 Wn.2d 614, 624, 106 P.3d 196 (2005) (internal quotation marks omitted) (quoting *State v. J.P.*, 149 Wn.2d 444, 450, 69 P.3d 318 (2003)). "Established relationship" would be superfluous if any "connection" between

6

offender and victim made an offender eligible for SSOSA, so long as the crime

was not the "sole connection" between the two. Similarly, we cannot assume the

second clause carries no meaning. As we must assume that the legislature intended

both clauses of RCW 9.94A.670(2)(e) to carry legal weight, the statute is

ambiguous.

Washington courts have not yet defined the requisite connection between an

offender and victim that triggers SSOSA eligibility.[2] Some cases touch on the

issue tangentially, but none directly address it. For instance, in *State v. Landsiedel*,

the Court of Appeals concluded that "victim" in RCW 9.94A.670(2)(e) refers to

the direct victim of the sexual crime, not a third party impacted by the offender's

crimes. 165 Wn. App. 886, 892, 269 P.3d 347 (2012). In *State v. Willhoite*, the

Court of Appeals held that an offender convicted of possession of child

pornography was ineligible for SSOSA because

> under the plain language of the statute . . . the defendant must have had an
> established relationship with the victim. Here, it is undisputed that Willhoite
> did not have a relationship with any of the victims. He was therefore
> ineligible for a SSOSA.

165 Wn. App. 911, 915, 268 P.3d 994 (2012). Notably, the Court of Appeals

summarized RCW 9.94A.670(2)(e) entirely by the "*established relationship*"

---

[2] The Court of Appeals recently affirmed its holding in *Pratt*. *State v. Spaulding*, No. 53253-1-II, slip op. at 5-6 (Wash. Ct. App. Nov. 17, 2020) http://www.courts.wa.gov/opinions/pdf/D2%2053253-1-II%20Published%20Opinion.pdf.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

language. But as Willhoite had never met his victims, it was unnecessary for that court to interpret any nuance in RCW 9.94A.670(2)(e). As courts have not yet resolved the ambiguity of RCW 9.94A.670(2)(e), we next review legislative history.

The state legislature enacted SSOSA in 1984 to permit trial courts to suspend the sentences for first time offenders in exchange for treatment and supervision. SUBSTITUTE H.B. 1247, 48th Leg., Reg. Sess. (Wash. 1984). The legislature developed the sentencing alternative with recommendations from the Sentencing Guidelines Commission, which in turn relied on input from treatment professionals and victim advocates. The commission reported to the legislature that treating offenders was a "major concern" for victims and their families because in many cases

> sex offenders commit their crimes against children related to them by blood or marriage. Family friends are also common offenders in these type of crimes. Given these relationships, many victims and their families want to see the offender receive help rather than a prison sentence.

SENTENCING GUIDELINES COMM'N, REPORT TO THE LEGISLATURE 2 (Feb. 1984). The commission also noted that "[w]ithout the cooperation of victims, the criminal justice system is ineffective in responding to sexual abuse; the effect of a sentencing policy on victims' attitudes toward reporting is therefore critical." *Id.* at 2-3. However, SSOSA did not explicitly require a relationship between offender and victim until 2004, with the adoption of RCW 9.94A.670(2)(e).

8

*State v. Pratt*, No. 98066-7

During the 2004 session, the legislature amended SSOSA in order to "further increase the protection of children from victimization by sex offenders." ENGROSSED SUBSTITUTE H.B. 2400, 58th Leg., Reg. Sess. (Wash. 2004). Testimony from the legislative hearings emphasized that "The majority of sex crimes against children are committed by people who have a relationship with the child" or occur in "the family context." H.B. REP. ON ENGROSSED SUBSTITUTE H.B. 2400, at 7-8, 58th Leg., Reg. Sess. (Wash.2004). These relationships between offender and victim make it less likely that abuse would be reported by victims or caregivers as "[f]amily members are often reluctant to report sex offenses if they feel the perpetrator will get a lengthy prison sentence." *Id.* at 8. The legislative report reiterated that SSOSA was designed to incentivize the reporting of abusers despite these close relationships:

> SSOSA has been an important and narrowly used option for victims. The substitute puts great weight on victim input and narrows the pool of eligible persons.
>
> . . . For those kids and their parents, you have to have the SSOSA option available. If the treatment option is eliminated, people will go underground.
>
> . . . .
>
> . . . Without the treatment program, there will be many families that do not disclose the criminal behavior.

*Id.* at 7-8.

9

Aside from adding RCW 9.94A.670(2)(e)'s requirement for an "established relationship" or "connection" between an offender and victim, the 2004 legislature also added additional SSOSA amendments to acknowledge that SSOSA victims, because of their relationships with their abusers, would have an investment in the offender's sentencing and treatment. The legislature provided multiple opportunities for victims to address the court. First, at the point of sentencing,

> [t]he court shall give great weight to the victim's opinion whether the offender should receive a treatment disposition under this section. If the sentence imposed is contrary to the victim's opinion, the court shall enter written findings stating its reasons for imposing the treatment disposition.

RCW 9.94A.670(4). And then, once a year throughout an offender's treatment,

> [t]he court shall conduct a hearing on the offender's progress in treatment at least once a year. At least fourteen days prior to the hearing, notice of the hearing shall be given to the victim. The victim shall be given the opportunity to make statements to the court regarding the offender's supervision and treatment.

RCW 9.94A.670(8)(b). And once more, at the termination of treatment,

> [a]t least fourteen days prior to the treatment termination hearing, notice of the hearing shall be given to the victim. The victim shall be given the opportunity to make statements to the court regarding the offender's supervision and treatment.

RCW 9.94A.670(9).

The legislature intended SSOSA's purpose to be a narrow tool in circumstances where a victim would be reluctant to report abuse and unwilling to participate in prosecution without the promise of a shortened sentence and

10

treatment for an offender. The ongoing involvement of a victim in his or her

abuser's supervision and treatment makes sense only where the legislature believed

a victim would be personally invested in their abuser's confinement and

rehabilitation. The legislature seems to have used the word "connection" in RCW

9.94A.670(2)(e) to mean two people who have a direct connection between one

another, rather than mere acquaintances who happen to share any number of

overlapping colleagues, friends, or relatives. SSOSA is limited to circumstances in

which abuse is likely to go underreported, such as where an abuser has a

protective, caretaking, or intimate association with their victim.

We conclude that the trial court's findings do not support a conclusion of

law that Pratt had the requisite "established relationship with, or connection to"

M.B. The trial court found that Pratt and M.B. "may not have really met," that

they were, "in essence, almost total strangers. There was no relationship. Short-

term, just meeting at this party [the day] before." 3 VRP (Jan. 5, 2018) at 360; 2

VRP (Oct. 3, 2017) at 311. Testimony at trial indicated that Pratt did not know

M.B.'s last name. M.B. could not recall whether she had ever spoken with Pratt

before the July 2016 incident, and both of M.B.'s parents testified that they never

met Pratt and did not believe that Pratt had ever interacted with their daughter.

The only person that testified at trial that M.B. and Pratt had definitely met before

conceded that "[Pratt and M.B.] may have said hi and bye, you know, but I don't

11

think they've ever really had too much of a conversation with each other." 1 VRP (Sept. 28, 2017) at 53-54. The trial court found that any interactions between Pratt and M.B. had been "brief passings." 2 VRP (Oct. 3, 2017) at 308.

Though Pratt and M.B. share an aunt by marriage, M.B. and Pratt's "brief passings" do not reach RCW 9.94A.670(2)(e)'s threshold for an "established relationship" or "connection." The legislature could not have intended that handing a child a marshmallow skewer hours before molesting them qualified as a "connection" required for a reduced prison sentence and treatment. Rather, the legislature intended SSOSA to be a narrow incentivizing mechanism to compel victims and their families to disclose abuse to law enforcement and cooperate with investigations despite a familiar relationship with the offender. Here, as the trial court found, there was simply no relationship between Pratt and M.B. prior to the commission of the crime. The "sole connection" between Pratt and M.B. was Pratt's act of molestation.

CONCLUSION

We hold that Pratt is statutorily ineligible for a SSOSA sentence. Accordingly, we affirm the Court of Appeals and remand to the trial court for resentencing.

*State v. Pratt*, No. 98066-7

Yu, J.

WE CONCUR:

González, C.J.

Stephens, J.

Johnson, J.

Madsen, J.

Montoya-Lewis, J.

Owens, J.

Whitener, J.

*State v. Pratt (Cory)*, No. 98066-7

No. 98066-7

GORDON McCLOUD, J. (dissenting)—"[W]here there is ambiguity in a criminal statute, doubts are resolved in favor of the defendant." *United States v. Bass*, 404 U.S. 336, 348, 92 S. Ct. 515, 30 L. Ed. 2d 488 (1971). This principle, known as the rule of lenity or strict construction, is fundamental to our tradition of criminal justice. *See id.*; *United States v. Wiltberger*, 18 U.S. (5 Wheat.) 76, 95, 5 L. Ed. 37 (1820) ("The rule that penal laws are to be construed strictly, is perhaps not much less old than construction itself."). The rule of lenity safeguards the vital principles of notice, due process, and fundamental fairness by requiring the State to speak clearly when crafting criminal statutes: it is "rooted in the concern of the law for individual rights, and in the belief that fair warning should be accorded as to what conduct is criminal and punishable." *Huddleston v. United States*, 415 U.S. 814, 831, 94 S. Ct. 1262, 39 L. Ed. 2d 782 (1974) (citing *Wiltberger*, 18 U.S. at 95; *Bass,* 404 U.S. at 348). It reflects "'the instinctive distaste against men languishing in prison unless the lawmaker has clearly said they should.'" *Bass*, 404 U.S. at 348 (quoting HENRY J. FRIENDLY, BENCHMARKS 209 (1967)).

1

*State v. Pratt (Cory)*, No. 98066-7
(Gordon McCloud, J., dissenting)

This court has repeatedly affirmed the rule's vitality. *State v. Evans*, 177 Wn.2d 186, 192-93, 298 P.3d 724 (2013); *State v. Jacobs*, 154 Wn.2d 596, 601, 115 P.3d 281 (2005); *In re Pers. Restraint of Hopkins*, 137 Wn.2d 897, 901, 976 P.2d 616 (1999); *In re Post Sentencing Review of Charles*, 135 Wn.2d 239, 250 n.4, 955 P.2d 798 (1998); *State v. Wilson*, 125 Wn.2d 212, 216-17, 883 P.2d 320 (1994); *State v. Hornaday*, 105 Wn.2d 120, 127, 713 P.2d 71 (1986). But there is tension in this court's decisions regarding when in the interpretive process the rule must be applied. Sometimes we have described the rule of lenity as a tool of last resort, applying it only once other interpretive tools, such as examination of legislative history, fail to resolve the statute's ambiguity. *E.g.*, *Evans*, 177 Wn.2d at 194; *Charles*, 135 Wn.2d at 250 n.4 ("We have explained that the rule only applies when a penal statute is ambiguous *and* legislative intent is insufficient to clarify the ambiguity."); *In re Pers. Restraint of Sietz*, 124 Wn.2d 645, 652, 880 P.2d 34 (1994).

But elsewhere, we have treated the rule of lenity as the *first* tool of statutory construction that we must turn to when faced with an ambiguous penal statute. *State v. Weatherwax*, 188 Wn.2d 139, 153, 392 P.3d 1054 (2017); *State v. Conover*, 183 Wn.2d 706, 712, 355 P.3d 1093 (2015) ("In criminal cases, we apply the rule of lenity to ambiguous statutes and interpret the statute in the defendant's

2

*State v. Pratt (Cory)*, No. 98066-7
(Gordon McCloud, J., dissenting)

favor."); *Jacobs*, 154 Wn.2d at 600-01; *In re Pers. Restraint of Greening*, 141

Wn.2d 687, 698, 9 P.3d 206 (2000); *Hopkins*, 137 Wn.2d at 901; *State v. Roberts*,

117 Wn.2d 576, 586, 817 P.2d 855 (1991). Though we have noted this

inconsistency in our approach to the rule's application, we have never definitively

resolved it. *E.g.*, *Southwick, Inc. v. State*, 191 Wn.2d 689, 710, 426 P.3d 693

(2018) (Gordon McCloud, J., dissenting); *State v. Coria*, 146 Wn.2d 631, 654, 48

P.3d 980 (2002) (Sanders, J., dissenting).

In Cory Pratt's case, the order in which the rule of lenity applies is outcome-

determinative. As the majority correctly explains, RCW 9.94A.670(e)(2) is

ambiguous: the two clauses of the statute point in different directions. Majority at

6-7. Thus, there are at least two plausible readings of the statute. One reading

would exclude Pratt from the special sexual offender sentencing alternative

(SSOSA) sentencing scheme: focusing on the first clause's requirement that the

defendant have had at least an "established relationship" with the victim, a

reasonable person could conclude, as the Court of Appeals majority did, that the

minimal contacts Pratt had with the victim were "too attenuated to satisfy the

statutory requirement." *State v. Pratt*, 11 Wn. App. 2d 450, 459-60, 454 P.3d 875

(2019), *review granted*, 195 Wn.2d 1023 (2020). But the other plausible reading

would include Pratt in the SSOSA scheme because his family ties to the victim and

3

*State v. Pratt (Cory)*, No. 98066-7
(Gordon McCloud, J., dissenting)

his interaction with her prior to the crime, however minimal, make his criminal contact with the victim not his "sole connection" to her. *Pratt*, 11 Wn. App. at 465 (Maxa, C.J., dissenting in part).

Upon identifying the ambiguity in the statute, the majority turns immediately to legislative history to seek clarity. Majority at 8. The majority's analysis of the legislative history is correct; as regards this statute, the legislature's intent seems particularly clear. *See* majority at 9. Thus, if the rule of lenity is available only as a last resort to resolve ambiguities that remain after consulting all other interpretive tools, the majority's conclusion is correct: Pratt is not entitled to the lower SSOSA sentence. But if the rule of lenity applies first, we would select the more lenient reading of the ambiguous statute and Pratt would be entitled to the benefits of SSOSA.

I would resolve the tension in our law by applying the rule of lenity first when construing ambiguous penal statutes. Notice is "the first essential of due process of law." *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391, 46 S. Ct. 126, 70 L. Ed. 322 (1926) (citing *Int'l Harvester Co. v. Kentucky*, 234 U.S. 216, 221, 34 S. S. Ct. 853, 58 L. Ed. 1284 (1914); *Collins v. Kentucky*, 234 U.S. 634, 638, 34 S. Ct. 924, 58 L. Ed. 1510 (1914)). And lenity's key function as a safeguard of this due process requirement has long been recognized. *See Bass*, 404 U.S. at 348;

4

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*McBoyle v. United States*, 283 U.S. 25, 27, 51 S. Ct. 340, 75 L. Ed. 816 (1931)

(fair notice requires clarity in the criminal law, even considering that "it is not

likely that a criminal will carefully consider the text of the law" before engaging in

unlawful activity); *Hornaday*, 105 Wn.2d at 127 (the rule of lenity is grounded in

the constitutional requirement of "fundamental fairness"); *In re Carson*, 84 Wn.2d

969, 973, 530 P.2d 331 (1975) (explaining that "when a deprivation of liberty is

involved, statutes should be strictly construed" (citing *Weber v. Doust*, 81 Wash.

668, 143 P. 148 (1914), *vacated*, 84 Wash. 330, 146 P. 623 (1915)). The rule also

reflects the bedrock principle of separation of powers—specifically that "because

of the seriousness of criminal penalties, and because criminal punishment usually

represents the moral condemnation of the community, legislatures and not courts

should define criminal activity." *Bass*, 404 U.S. at 348; *see also Hopkins*, 137

Wn.2d at 901 (describing the rule of lenity as "a basic and required limitation on a

court's power of statutory interpretation whenever the meaning of a criminal

statute is not plain"). It serves as "a check on governmental power when the basis

for government's assertion of that power is questionable or ambiguous."

*Southwick, Inc.*, 191 Wn.2d at 703 (Gordon McCloud, J., dissenting). In this way,

the rule of lenity encourages legislative accountability and precision in statutory

drafting—it pushes the legislature to make its intent clearer in the text of the

*State v. Pratt (Cory)*, No. 98066-7
(Gordon McCloud, J., dissenting)

statutes it passes. *See United States v. R.L.C.*, 503 U.S. 291, 308-09, 112 S. Ct. 1329, 117 L. Ed. 2d 559 (1992) (Scalia, J., concurring); Zachary Price, *The Rule of Lenity as a Rule of Structure*, 72 FORDHAM L. REV. 885, 940-41 (2004).

The rule of lenity best protects these foundational values when, faced with an ambiguous criminal statute, we apply it first—before turning to legislative history or other interpretive tools. We followed this approach in *Weatherwax* and *Conover*, unanimous opinions that both dealt with questions of interpretation of ambiguous sentencing statutes. *Weatherwax*, 188 Wn.2d at 142; *Conover*, 183 Wn.2d at 711. I would follow the same approach here. Because it is ambiguous as to what type of "relationship" or "connection" makes a defendant statutorily entitled to the benefits of SSOSA's more lenient sentencing scheme, RCW 9.94A.670(e)(2) failed to provide "fair warning" of the consequences of Pratt's crime. *McBoyle*, 283 U.S. at 27. There are two plausible readings of the text of the statute; one would include Pratt within the ambit of SSOSA. Accordingly, the principles of fairness, notice, and due process animating the rule of lenity require that Pratt receive the benefit of the more lenient reading of the statute. *Weatherwax*, 188 Wn.2d at 155-56.

I therefore respectfully dissent.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*State v. Pratt (Cory)*, No. 98066-7
(Gordon McCloud, J., dissenting)

_____
Gordon McCloud, J.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

8