# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 60548-1-II |
| Respondent, | |
| v. | |
| NATHAN MICHAEL BOWERS, | UNPUBLISHED OPINION |
| Appellant. | |

CRUSER, J.—Nathan Michael Bowers appeals his convictions of first and second degree assault. Bowers asks that we reverse his convictions, dismiss his first degree assault charge, and remand for a new trial "on the remaining counts."[1] Bowers asserts that the trial court erred by admitting statements Bowers made to law enforcement while in custody, by denying Bowers' motion to dismiss for failure to preserve materially exculpatory evidence, by excluding some of Bowers' trial testimony, by denying Bowers' request for a self-defense jury instruction on his second degree assault charge, and by including the aggressor jury instruction for his first degree assault charge. Bowers also argues that he received ineffective assistance of counsel and that his alleged errors necessitate a new trial under the cumulative error doctrine. The State argues that the trial court did not err and that Bowers did not receive ineffective assistance of counsel.

---

[1] Br. of Appellant at 57.

We hold that the trial court did not err, Bowers received effective assistance of counsel, and the cumulative error doctrine does not apply. Accordingly, we affirm Bowers' convictions.

FACTS

I. BACKGROUND

In April 2023, Bowers was charged with one count of first degree assault, one count of second degree assault with a special finding of domestic violence, and one count of interfering with reporting of domestic violence. Bowers' associate Clinton Callaway was also prosecuted for his involvement in the same incident.[2] When the incident occurred, Bowers' wife Danielle[3] was living in Vancouver, Washington, while Bowers was living in Idaho for work.[4] Danielle was in a relationship with a man named James Fairbrother, who was living at the Bowers' residence during the time of the incident. Bowers knew that Danielle was in a relationship with Fairbrother.

During the night in question, law enforcement responded to multiple calls from Danielle's neighbors. The neighbors reported that two men were "banging and screaming," at Danielle's house, using profane language, and attempting to break in. Ex. 23 at 0 min., 25 sec. Dispatch also received a call from Danielle during the incident. Danielle stated that her "ex-husband" was trying to break into her house but later clarified that he was still her husband who was not living in the home. Ex. 25 at 0 min., 17 sec. Bowers repeatedly told Danielle to "open this f***ing door." *Id.* at 1 min., 49 sec., and 2 min., 56 sec. Seconds later, Danielle told dispatch that the men had kicked

---

[2] Callaway pleaded guilty for his involvement in the assault and testified at Bowers' trial.

[3] We refer to Ms. Bowers as "Danielle" for clarity's sake.

[4] Danielle testified that she and Bowers had separated and were "talking about divorce for quite some time" before he moved. Verbatim Rep. of Proc. at 198.

her door down. On the recording, a voice says, "[F]ind him right now," then there are noises as if someone were gagging or choking. *Id.* at 3 min., 50 sec. Danielle told dispatch that Bowers had grabbed her by her throat. The call ended abruptly.

According to Danielle, the evening of the incident she and Fairbrother were sitting at home and about to prepare dinner when they suddenly heard yelling. Bowers was at the back door and Callaway was at the front door; both were kicking and screaming. Callaway then kicked the door off of its frame, and Bowers instructed Callaway to find Fairbrother. Danielle stated that Bowers held her against the wall with both of his hands, she could not breathe, she felt lightheaded, and she felt afraid. Bowers also tried to take Danielle's phone away from her when he realized that the police were on the other line. Bowers went downstairs, and when Danielle followed him, she saw that Bowers was "straddling [Fairbrother] and repetitively punching him in the head" while Callaway repeatedly told Bowers to "kill him." Verbatim Rep. of Proc. (VRP) at 223. Danielle tried to pull Bowers off Fairbrother and was elbowed in the face. The police arrived shortly thereafter.

When police arrived, they directed anyone inside to leave the residence. Officers noted that the door frame was broken and that it looked like someone had forced their way in. Danielle and Callaway came out, but Bowers remained in the basement and made a statement to police implying that he was rendering aid to someone. Bowers was kneeling over Fairbrother, who was lying in a supine position. An officer noticed a hook-shaped knife on the ground near Fairbrother's knee.[5] Fairbrother had "significant facial injuries," which included bleeding and so much swelling that

---

[5] Danielle stated at trial that she knows Fairbrother carries a pocketknife. One officer testified at trial that there may have been two knives at the scene.

"it looked like his eyes were swollen shut." *Id.* at 387. Fairbrother could make noises, but not use words to respond to the officers' questions. Bodycam footage showed blood on the bathroom floor where Fairbrother's head had been. Danielle had red marks on her throat when law enforcement arrived at the scene. Additionally, in photos taken after the incident, Danielle had bruising on both sides of her neck and on her face. Danielle stated that the mark on her face was from being hit by Bowers while trying to get him off Fairbrother.

Officers noted that there was no evidence that anyone was stabbed or cut.

Fairbrother was treated by paramedics, and Callaway and Bowers were detained. Bowers was taken to the hospital by police for a breathing problem, then taken to jail. When Fairbrother arrived at the hospital, he was in critical condition. He was diagnosed with "a right mandible fracture, . . . a right orbital blowout fracture, . . . a concussion, . . . a small laceration" near his eye, a "subconjunctival hemorrhage," and "acute hypoxic respiratory failure." *Id.* at 323, 484. Fairbrother was put on a ventilator. During Danielle's testimony, the State introduced photographs of Fairbrother on the ventilator and photographs of his injuries.

Bowers was charged with second degree assault (domestic violence) against Danielle, first degree assault against Fairbrother, and interfering with the reporting of domestic violence.

## II. BOWERS' AND CALLAWAY'S TRIAL TESTIMONY

Bowers stated during his testimony that he had gone out to dinner with Callaway the night of the incident, then wanted to spend the night in Vancouver before driving back to Coeur d'Alene, Idaho, where he had been staying while working in Eastern Washington. Bowers stated that he did not have a key to the house with him, and when he looked in the window, he saw Fairbrother with Danielle in the kitchen. He started yelling for her to let him in. Bowers stated that he was at the

side door, and when he approached the front door, it was already open. Bowers stated that Danielle approached him with a phone in her hand; he "pushed her against the wall" with his forearm on her upper chest, then went downstairs. VRP at 604; 647. Bowers testified that he saw Fairbrother lying on the floor while "coughing up blood and choking," so he turned Fairbrother onto his side and checked his airway. Then the police arrived.

Defense counsel then asked Bowers about Danielle's ability to bruise. Bowers answered in the affirmative when his counsel asked if Bowers came to know, through being with Danielle for "many years," that she bruises easily. *Id.* at 607. Defense counsel followed up by asking if contact with Danielle "would likely produce bruises," and the court sustained an objection based on speculation. *Id.* Counsel then asked if Bowers was aware of "any medical condition that would lead to bruising" on Danielle, and the State objected again. *Id.* The court asked the jury to leave while it resolved the issue. Defense counsel explained to the court that Bowers is aware that his wife is anemic and "that that causes easy bruising," which has to do with how Danielle sustained the bruises and how much force he applied. *Id.* at 608. The court sustained the objection.

Callaway also testified during trial. He stated that when he approached the front window of Danielle's home, he observed Danielle and Fairbrother having sexual intercourse in the living room. Callaway stated he then forced open the door, after which Fairbrother "squared up at [him]" and ran down the stairs. *Id.* at 543. At the bottom of the stairs, Callaway stated that Fairbrother pulled out a knife and swung it at Callaway. Callaway stated he hit Fairbrother once "as hard as [he] could." *Id.* at 546. Fairbrother then fell backwards onto some cabinets, "fell again," Callaway ran upstairs, and the police arrived at the same time. *Id.* at 548.

5

III. PRE- AND POST-TRIAL PROCEDURAL HISTORY

Before trial, the superior court conducted a CrR 3.5 hearing to determine the admissibility of some of Bowers' statements. The State wished to introduce statements that officers heard and that were recorded on various officers' body cameras. Specifically, police heard Bowers say, " 'I've got a hold on him[,] he may be choking on his blood.' " CP at 209. When handcuffed and walking to the police car, Bowers stated, "I just caught my wife cheating on me, how would you f***ing feel?" and "that guy deserves worse." Ex. 1 at 7 min., 9 sec. to 7 min., 40 sec. Before being read his *Miranda*[6] rights, Bowers told officers that "that guy pulled a knife on us." *Id.* at 16 min., 25 sec. After being read his rights, Bowers "indicated he understood his rights," expressed a desire to speak with his attorney, stated multiple times that officers were at "his house," and that Danielle "was cheating on him." CP at 211. Officers did not ask any questions while Bowers provided this information, other than to ask if Bowers "currently lives at this address" and the name of Bowers' friend (referring to Callaway). Ex. 1 at 18 min., 21 sec..[7] Before walking away from the vehicle, the officer stated that she noticed there was blood on Bowers' hand and a scratch on his face and asked if Bowers needed medical attention. Before searching Bowers, an officer asked Bowers if he had anything on his person that would "stab [ ] or poke" the officer; Bowers replied in the negative. Ex. 1 at 38 min., 45 sec. Before leaving the scene, Bowers asked if police were arresting his friend. An officer replied in the affirmative, and Bowers stated that Callaway

---

[6] *Miranda v. Arizona*, 396 U.S. 868, 90 S. Ct. 140, 24 L. Ed. 2d 122 (1969).

[7] Although not mentioned in the trial court's findings of fact from the CrR 3.5 hearing, after being asked Callaway's name, Bowers stated that Callaway had "nothing to do" with what happened and should be "set free." Ex. 1 at 18 min., 35 sec. to 18 min., 58 sec. The officer then told Bowers that Callaway was not speaking with police.

"didn't do anything wrong" and that "it was all me." *Id.* at 1 hour, 2 min., 10 sec. to 1 hour, 2 min., 50 sec. While at the hospital, Bowers told medical staff "that he caught his wife cheating and had a fit of rage." CP at 209. At multiple points throughout the process of being detained, Bowers asked officers what they would do if they found out their wife was cheating on them.

The trial court determined that all statements were admissible. The statements that Bowers made when police first entered the home were admissible because he was not yet in custody. Bowers' statements to police after being read his *Miranda* rights were admissible because they were spontaneous; police had not interrogated him or otherwise coerced him to make those statements. Bowers' statements when being transported from one car to another were admissible for the same reason. Finally, the statements that Bowers made while speaking to medical personnel were admissible because those statements were not made to law enforcement.

Bowers filed a pre-trial motion to dismiss all charges for spoliation of evidence. He stated that police had found two knives when they arrived at the scene; one on the ground, under Fairbrother's leg, and another "clipped into the inside of [ ] Fairbrother's jeans." *Id.* at 44. However, officers did not collect the knives or log them into evidence. Bowers claimed that this failure deprived him of the opportunity to show that Fairbrother "was directly connected to those knives, and that he attacked Clinton Callaway and/or Nathan Bowers," necessitating the use of self-defense. *Id.* at 45.[8]

The trial court denied Bowers' motion to dismiss. The trial court concluded that there was no effort on the part of law enforcement to hide the existence of the knives because they openly

---

[8] Among other arguments, the State argued in response that Bowers and Callaway were intruders into the home and that the occupants of the home—Danielle and Fairbrother—had a right to use reasonable force to defend themselves against such intruders.

talked about the knives in the body camera footage; that Bowers could easily connect Fairbrother to the knives even in the absence of testing of the knives for Fairbrother's fingerprints or DNA because the knives were found either on or near Fairbrother's person; and that Bowers would not be hampered in presenting his theory of self-defense and would not therefore suffer material prejudice.

During the finalization of jury instructions, the trial court declined the defense's proposed jury instruction on self-defense for Bowers' second degree assault charge. It reasoned that the defense had not provided enough evidence to show that Bowers acted in self-defense against Danielle. The court did allow a self-defense instruction for first degree assault, as Callaway claimed self-defense and the State had asserted that Bowers was an accomplice to Callaway. In addition to this instruction, the trial court gave the aggressor instruction, which states that no person may "create a necessity for acting in self-defense and thereupon use, offer, or attempt to use force upon or toward another person." *Id.* at 153.

The jury found Bowers guilty on all counts. Bowers appeals his assault convictions.[9]

ANALYSIS

I. CUSTODIAL STATEMENTS AFTER INVOKING THE RIGHT TO COUNSEL

Bowers contends that the trial court erroneously admitted statements that he made to law enforcement because the officers elicited his statements after he invoked his right to counsel and the statements were involuntary. We disagree.

---

[9] Bowers does not appeal his conviction of interfering with the reporting of domestic violence.

*A. Legal Principles*

When the State wishes to offer a statement by the defendant into evidence, the superior court must conduct a hearing on the admissibility of the statement. CrR 3.5(a). "To preserve a [particular] *Miranda* waiver advisement issue for appeal, a defendant must raise the issue at his 'CrR 3.5 [hearing] or the fact-finding portions of the proceedings.' " *State v. Campos-Cerna*, 154 Wn. App. 702, 710, 226 P.3d 185 (2010) (second alteration in original) (quoting *State v. Spearman*, 59 Wn. App. 323, 325, 796 P.2d 727 (1990)).

We generally do not address issues for the first time on appeal, but may do so if the alleged error is "manifest" and affects a constitutional right. RAP 2.5(a). A manifest constitutional error occurs if " 'the asserted error had practical and identifiable consequences in the trial of the case.' " *State v. A.M.*, 194 Wn.2d 33, 38, 448 P.3d 35 (2019) (internal quotation marks omitted) (quoting *State v. O'Hara*, 167 Wn.2d 91, 99, 217 P.3d 756 (2009)). However, if an appellant raises an issue for the first time on appeal but fails to argue that an exception to RAP 2.5(a) applies, they waive that argument. *State v. Lindsey*¸ 177 Wn. App. 233, 247, 311 P.3d 61 (2013). An appellant similarly waives an argument if they raise it for the first time in their reply. *In re Pers. Restraint of Rhem*¸ 188 Wn.2d 321, 327, 394 P.3d 367 (2017).

A trial court's unchallenged findings of fact on a CrR 3.5 hearing are verities on appeal. *State v. Escalante*, 195 Wn.2d 526, 531, 461 P.3d 1183 (2020).

*B. Application*

Bowers argues that the trial court erred by admitting custodial statements that he made to law enforcement. According to Bowers, officers did not cease questioning and made statements to Bowers "likely to elicit a response" after Bowers had requested an attorney, thereby violating

Bowers' Fifth Amendment right to counsel. Br. of Appellant at 23-25. The State responds that Bowers has waived this argument because he did not specifically object to these statements or raise the arguments he now raises on appeal at the trial court, nor did he provide a RAP 2.5(a) analysis in his opening brief. The State further contends that although he raises a constitutional issue, the issue is not "manifest" because it did not have "identifiable" consequences on the outcome of the trial. Br. of Resp't at 45.

We agree with the State and conclude that Bowers failed to preserve the issue he now asks us to review on appeal. Bowers did not argue below that the statements were involuntary, and he did not address RAP 2.5(a) in his opening brief. In his reply brief, Bowers asserts that the fact of a CrR 3.5 hearing itself preserves all issues that may later be raised on appeal related to the admission of a defendant's statements because the fact of a CrR 3.5 hearing operates as a blanket objection to the admission of a defendant's statements on any and all bases. However, as we note above, a defendant must draw the trial court's attention to the specific issue he believes warrants suppression of his statements at trial to preserve the argument for appeal. *Campos-Cerna*, 154 Wn. App. at 710. The reason for this rule is well illustrated in this case, where Bowers attempts to raise arguments that are not addressed (because he did not ask them to be addressed) in the trial court's findings of fact and conclusions of law. His claim, for example, that officers were making comments that were designed to elicit an incriminating response is unaddressed in the findings of fact and conclusions of law.

In addition to Bowers' failure to preserve his CrR 3.5 arguments for appeal, his failure to assign error to any of the trial court's findings of fact is fatal to his claims. The trial court entered findings of fact and conclusions of law as required by CrR 3.5. Consistent with the requirements

of CrR 3.5, the trial court set forth the "undisputed facts." CP at 208 (capitalization omitted). The undisputed factual findings, which are verities on appeal, unequivocally establish that Bowers' statements were voluntary, not coerced, and not obtained in violation of the Fifth Amendment.[10] Bowers fails to assign error to any of these facts, did not object below to the trial court's characterization of these facts as "undisputed" and does not assign error to this characterization on appeal, and fails to assign error to the trial court's failure to address, in its findings of fact, any of the facts elicited at the CrR 3.5 hearing.

By failing both to raise the arguments in the trial court that he now raises on appeal or to assign error to any of the trial court's findings of fact, Bowers waives his challenge to the admission of his statements at trial. And even if not waived, his challenge would have failed on the merits.

## II. FAILURE TO PRESERVE EVIDENCE

Bowers next argues that the trial court erred in denying his motion to dismiss for failure to preserve evidence that was either materially exculpatory or that was potentially useful. As it relates to the latter claim, Bowers argues that the officers acted in bad faith in failing to preserve the evidence. We disagree. We also disagree with Bowers' claim that he received ineffective assistance of counsel because his attorney did not request a jury instruction regarding spoliation of evidence.

---

[10] *See* "Undisputed Facts" 8, 21, 22, 23, 29, 30, 31, 34, 35, and 36. CP at 208-211 (capitalization altered).

*A. Legal Principles*

    i. <u>Preservation of Evidence</u>

Due process requires that a defendant have "a meaningful opportunity to present a complete defense"; the State's failure to preserve "materially exculpatory evidence" violates the defendant's due process rights and necessitates dismissal of the charge(s). *State v. Wittenbarger*, 124 Wn.2d 467, 474-75, 880 P.2d 517 (1994) (citing *California v. Trombetta*, 467 U.S. 479, 104 S. Ct. 2528, 81 L. Ed. 2d 413 (1984)). Evidence is materially exculpatory if it had an "exculpatory value that was apparent before it was destroyed" and the defendant could not acquire comparable evidence "by other reasonably available means." *Id.* at 475. If the unpreserved evidence was not materially exculpatory, the State violates due process only if the evidence was "potentially useful" to the defense and the defendant can prove that the State acted in bad faith by failing to preserve it. *Id.* at 477. To prove bad faith, the defendant must show that law enforcement was aware of the evidence's exculpatory value " 'at the time it was lost or destroyed' " and " 'put forward specific, nonconclusory factual allegations that establish improper motive.' " *State v. Armstrong*, 188 Wn.2d 333, 345, 394 P.3d 373 (2017) (internal quotations omitted) (quoting *Cunningham v. City of Wenatchee*, 345 F.3d 802, 812 (9th Cir. 2003)).

"A trial court's determination that missing evidence is materially exculpatory is a legal conclusion which we review de novo." *State v. Burden*, 104 Wn. App. 507, 512, 17 P.3d 1211 (2001). We will uphold a trial court's denial of a motion to dismiss for failure to preserve exculpatory evidence if the trial court's decision was based on substantial evidence. *State v. Ortiz*, 119 Wn.2d 294, 301-02, 831 P.2d 1060 (1992) (plurality opinion). "Substantial evidence is

evidence sufficient to persuade a fair-minded, rational person of the finding's truth." *State v. Pratt*, 11 Wn. App. 2d 450, 457, 454 P.3d 875 (2019), *aff'd*, 196 Wn.2d 849, 479 P.3d 680 (2021).

ii. Ineffective Assistance of Counsel

Washington courts determine whether a defendant's trial attorney provided constitutionally sufficient representation by using the test developed in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984) by the United States Supreme Court. *State v. Estes*, 188 Wn.2d 450, 457, 395 P.3d 1045 (2017). To succeed on an ineffective assistance claim, the defendant must prove that counsel's performance was both deficient and that prejudice resulted from the deficient performance. *Id.* at 457-58. Deficient performance is that which falls " 'below an objective standard of reasonableness based on consideration of all the circumstances.' " *State v. Kyllo*, 166 Wn.2d 856, 862, 215 P.3d 177 (2009) (quoting *State v. McFarland*, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995)). We begin our inquiry with a "strong presumption that counsel's performance was reasonable." *Id.* A defendant may rebut this presumption of reasonableness by demonstrating that no legitimate tactic could explain counsel's decision. *State v. Grier*, 171 Wn.2d 17, 33, 246 P.3d 1260 (2011). The prejudice prong requires the defendant to demonstrate a substantial likelihood that the result of the proceeding would have been different but for counsel's alleged errors. *Id.* at 34. If either prong of this test is not satisfied, we need not consider the other prong. *Kyllo*, 166 Wn.2d at 862.

Additionally, a claim of ineffective assistance "based upon counsel's failure to request a particular jury instruction" requires the defendant to show that they were entitled to the instruction. *State v. Thompson*, 169 Wn. App. 436, 495, 290 P.3d 996 (2012). Ineffective assistance of counsel

does not include a failure to raise a novel legal theory or a theory that is unlikely to succeed. *State v. Brown*, 159 Wn. App. 366, 371-72, 245 P.3d 776 (2011).

*B. Application*

### i. "Materially Exculpatory" or "Potentially Useful" Evidence

Bowers argues that the trial court erred by denying his motion to dismiss the first degree assault charge based on the State's failure to preserve the knives at the scene. He contends that both the knife that was near Fairbrother's leg and the knife in Fairbrother's jeans were materially exculpatory evidence, or, in the alternative, that they were potentially useful evidence that the police failed to preserve in bad faith. In support of this assertion, Bowers states that he and Callaway had told the police that Fairbrother attacked them with a knife and that officers were aware of the existence of the knives on the scene. According to Bowers, the knives would have contained Fairbrother's DNA and would therefore have been exculpatory; they likewise would have lacked any evidence that Bowers or Callaway handled the knives, "thereby precluding any negative inference of the jury potentially believing that one of them wielded a knife." Br. of Appellant at 31. If we were to conclude that the knives were merely "potentially useful," Bowers argues that law enforcement was still at fault; he claims that officers acted negligently by failing

to seize the knives from the scene and that such "mismanagement" qualifies as bad faith. *Id.* at 32-33.[11]

The State argues that the trial court did not err by denying Bowers' motion to dismiss because the knives were not materially exculpatory, other comparable evidence existed, and the officers did not act in bad faith. We agree with the State and conclude that the trial court's denial of Bowers' motion to dismiss the first degree assault charge was based on substantial evidence, as the knives possessed no immediately apparent exculpatory value and Bowers was still able to argue his theory of the case.

Bowers asserts that the knives were materially exculpatory based on Callaway's and Bowers' indications to the police that Fairbrother approached them with a knife, and that "[b]y the State's logic, these knives would only be exculpatory if law enforcement had a subjective belief that Callaway and/or [ ] Bowers were acting in self-defense." Reply Br. at 4. However, the reason that the knives are not exculpatory is not because of the "subjective belief"[12] of the officers, but rather the evidence that was apparent to officers upon arrival at the scene. When officers arrived, they saw a severely injured Fairbrother lying on the floor. Bowers had blood on his hand. And there was no evidence that anyone was stabbed or cut. The crime scene indicated that Fairbrother

---

[11] Bowers also argues that we should reject the *Youngblood* test, revisit the *Gunwall* analysis that our supreme court undertook in *Wittenbarger*, and employ a "balancing test" to evaluate the reasonableness of the State's failure to preserve evidence. Br. of Appellant at 40 (quoting *Wittenbarger*, 124 Wn.2d at 492-495 (Johnson, J. dissent) (discussing *Arizona v. Youngblood*, 488 U.S. 51, 109 S. Ct. 333, 102 L. Ed. 2d 281 (1988), and *State v. Gunwall*, 106 Wn.2d 54, 720 P.2d 808 (1986))). The State correctly notes that we cannot apply a new standard because we are bound by the Washington supreme court's rule. "[O]nce this court has decided an issue of state law, that interpretation is binding on all lower courts until it is overruled by this court." *State v. Gore*, 101 Wn.2d 481, 487, 681 P.2d 227 (1984).

[12] Reply Br. at 4.

was assaulted. The existence of knives belonging to Fairbrother, given this evidence, would not exculpate Bowers from guilt. Additionally, Bowers was able to introduce evidence of the presence of knives at the scene through trial testimony by Danielle, Bowers, Callaway, and responding officers. This testimony provides Bowers with "comparable" evidence. *Wittenbarger*, 124 Wn.2d at 475.

To prove that the State violated Bowers' right to due process on the theory that the knives were potentially useful, Bowers must demonstrate bad faith on the part of the officers through a showing that law enforcement was aware of the exculpatory value of the knives and facts that establish an improper motive on the part of the officers. *Armstrong*, 188 Wn.2d at 345.[13] We have already determined that the knives possessed no immediately apparent exculpatory value. Additionally, Bowers fails to make " 'specific, nonconclusory factual allegations that establish improper motive.' " *Id.* (internal quotations omitted) (quoting *Cunningham*, 345 F.3d at 812). Therefore, Bowers has not demonstrated that the charge of first degree assault should be dismissed for potential usefulness/bad faith.

Bowers also argues that it was "vital"[14] to his case that the actual knives be preserved to prove that Fairbrother wielded a knife. But as the trial court pointed out, the purpose of introducing the knives was not to show that Callaway or Bowers were actually stabbed, but rather that Fairbrother's attacker acted in self-defense when he inflicted injury on Fairbrother because the attacker *feared* being stabbed. This information could be conveyed through testimony, coupled

---

[13] Bowers states in his brief that mismanagement of the evidence would suffice for dismissal of the first degree assault charge. But Bowers did not seek dismissal of this case under CrR 8.3(b) at the trial court. Thus, these cases are inapposite.

[14] Reply Br. at 5.

with the undisputed fact that there was one knife near Fairbrother and another on his person. The trial court therefore did not err by denying Bowers' motion to dismiss.

ii. Ineffective Assistance of Counsel

Bowers asserts that "[i]n the alternative, defense counsel was ineffective for failing to propose a jury instruction regarding law enforcement's failure to preserve evidence," and that we should remand for a new trial. Br. of Appellant at 41 (boldface omitted). Bowers cites example trial court instructions from the Ninth Circuit and Arizona state courts that mention the government's spoliation of evidence, claiming that the Arizona instruction is "a recognized remedy for failure to preserve evidence in the absence of bad faith." Br. of Appellant at 46. Bowers argues that, if given an instruction on the government's failure to preserve evidence, the jury would view the knives "in a more favorable light for the defense," because these instructions allow the jury to draw the inference that the evidence would have been helpful to the defendant, and that there was "no strategic reason" not to request such an instruction. *Id.* at 47.

We decline to hold that failure to raise a novel jury instruction constitutes ineffective assistance of counsel. To prove ineffective assistance, Bowers must show that he was entitled to such a jury instruction,[15] but he cites no authority that this instruction has previously been used in a criminal case in Washington state.[16] Bowers argues that this instruction cannot be considered

---

[15] *State v. Thompson*, 47 Wn. App. 1, 7, 733 P.2d 584 (1987).

[16] In *State v. McCormack*, No. 56951-5-II, slip op. at 20 (Wash. Ct. App. July 25, 2023) (unpublished), https://www.courts.wa.gov/opinions/pdf/D2%2056951-5-II%20Unpublished%20Opinion.pdf, this court treated a defense as "non-existent" that had not been made in Washington state. Although Bowers raises instructions that have been given in other jurisdictions, we may treat the spoliation instruction as novel because he has not established that it has been given in a Washington court.

novel because it is used in other jurisdictions, but this distinction does not establish that Bowers was *entitled* to receive a jury instruction on the spoliation of evidence. In sum, Bowers does not establish deficient performance.

Bowers also fails to show prejudice resulting from the lack of a spoliation jury instruction. Bowers claims that he suffered prejudice because the jury could "doubt the veracity of the defense's theory of the case," that "[t]he [failure to preserve evidence] instruction would have allowed the jury to infer that law enforcement's failure to seize the knives was because they were actually exculpatory material," and that the jury would be more likely to believe Bowers' and Callaway's testimony that Fairbrother wielded a knife. Reply Br. at 8. But as we explained above, the presence of the knives at the scene was established by other evidence and was not disputed. Bowers fails to demonstrate a reasonable probability that the outcome of the trial would have been different had the trial court given one of these instructions.

### III. EXCLUSION OF BOWERS' TESTIMONY

Bowers argues that the trial court erred in excluding Bowers' proposed testimony about Danielle's anemia diagnosis and bruising on the basis that it was speculative. We disagree.

*A. Legal Principles*

We review a trial court's decision to admit or exclude evidence for abuse of discretion. *State v. Neal*, 144 Wn.2d 600, 609, 30 P.3d 1255 (2001). "An abuse of discretion exists '[w]hen a trial court's exercise of its discretion is manifestly unreasonable or based upon untenable grounds or reasons.' " *Id.* (alteration in original) (quoting *State v Stenson*, 132 Wn.2d 668, 701, 940 P.2d 1239 (1997)). A witness may only testify to a matter if the party wishing to admit the evidence proves that the witness possesses personal knowledge of the matter. ER 602. Lay witnesses must

limit their testimony to opinions or inferences "which are [ ] rationally based on the perception of the witness, . . . and [ ] not based on scientific, technical, or other specialized knowledge within the scope of rule 702." ER 701.

*B. Application*

During Bowers' direct examination, defense counsel asked Bowers whether contact with Danielle was "likely [to] produce bruises," and the trial court sustained the State's objection based on speculation. VRP at 607. Defense counsel then asked if Bowers was aware that Danielle had a medical condition that would lead to bruising, and the State objected again. The trial court sustained the State's objection outside of the presence of the jury, and defense counsel moved on to another line of questioning.

Bowers contends that his testimony regarding Danielle's likelihood of bruising was not speculative because Danielle is anemic and Bowers could "personally observe the effects of that anemia" over the course of their relationship. Br. of Appellant at 49. Bowers argues that Danielle's anemia was relevant to support Bowers' theory that she became bruised on her neck by Bowers "pressing against her upper chest" in self-defense rather than from assaulting Danielle. Reply Br. at 10. Bowers claims that the trial court abused its discretion by excluding his testimony as speculative.

The State responds that the trial court did not abuse its discretion because Bowers "did not proffer sufficient foundation establishing that Bowers had personal knowledge of Danielle having anemia that would cause susceptibility to bruising." Br. of Resp't at 68. In response to Bowers' argument that he was prevented from arguing that Danielle's bruising was the product of " 'relatively slight contact' " rather than strangulation, the State responds that defense counsel was

not precluded from making this argument during closing and therefore any error is harmless. Br. of Resp't at 70 (quoting Br. of Appellant at 49).

We agree with the State that the trial court did not abuse its discretion by excluding Bowers' testimony because there was not sufficient foundation to support it. Even if Bowers had personal knowledge that Danielle had been diagnosed with anemia, Bowers was not qualified to connect Danielle's anemia to a particular level of force that could cause bruising. Moreover, as the State notes, Bowers was permitted to testify without objection that Danielle bruised easily. The trial court did not abuse its discretion in excluding Bowers' proposed testimony regarding Danielle's anemia diagnosis and bruising.

## IV. SELF-DEFENSE JURY INSTRUCTION

Bowers next contends that the trial court erred by denying his request for a self-defense jury instruction on his second degree assault charge. We disagree.

*A. Legal Principles*

We review de novo a trial court's refusal to provide a self-defense jury instruction for lack of evidence. *State v. Fisher*, 185 Wn.2d 836, 849, 374 P.3d 1185 (2016). Under RCW 9A.16.020(3), a use of force is lawful if it is not more than necessary to "prevent[ ] or attempt[ ] to prevent an offense against his or her person." The defendant has the initial burden of providing some evidence that they acted in self-defense. *Kyllo*, 166 Wn.2d at 863. "The use of force is lawful and justified where the defendant has a 'subjective, reasonable belief of imminent harm from the victim.' " *State v. Grott*, 195 Wn.2d 256, 266, 458 P.3d 750 (2020) (quoting *State v. LeFaber*, 128 Wn.2d 896, 899, 913 P.2d 369 (1996), *abrogated on other grounds by O'Hara*, 167 Wn.2d 91).

After the defendant meets the initial burden, the State must disprove self-defense beyond a reasonable doubt. *State v. Walden*, 131 Wn.2d 469, 473, 932 P.2d 1237 (1997).

"Evidence of self-defense is evaluated 'from the standpoint of the reasonably prudent person, knowing all the defendant knows and seeing all the defendant sees.' " *Id.* (quoting *State v. Janes*, 121 Wn.2d 220, 237, 850 P.2d 495 (1993)). This standard requires the trial court to

> apply a mixed subjective and objective analysis. The subjective aspect of the inquiry requires the trial court to place itself in the defendant's shoes and view the defendant's acts in light of all the facts and circumstances known to the defendant. . . . The objective aspect requires the court to determine what a reasonable person in the defendant's situation would have done.

*State v. Walker*, 136 Wn.2d 767, 772, 966 P.2d 883 (1998) (internal citations omitted). The trial court should review the evidence in the light most favorable to the defendant. *Fisher*, 185 Wn.2d at 849.

*B. Application*

Bowers argues that he is entitled to a new trial because the trial court refused to give a self-defense instruction for his second degree assault charge against Danielle. Bowers' theory of the case is that Danielle "approached Mr. Bowers aggressively with the cell phone in her hand," which required Bowers to "push her away from him, using his forearm near the neck area." Br. of Appellant at 51. Bowers contends that the trial court "mistakenly believed" that Bowers had denied strangling Danielle,[17] but pushing her away with his arm could constitute "strangulation" under the jury instructions' definition of the term, and the lack of a self-defense instruction precluded the jury from considering Bowers' theory. *Id.* at 52.

---

[17] Bowers testified multiple times that he did not strangle Danielle.

We conclude that the trial court did not err by denying Bowers' proposed self-defense instruction for second degree assault. A showing of self-defense requires that Bowers apprehend imminent harm, but Bowers did not testify that he thought Danielle was about to hurt him or that he needed to defend himself.[18] Bowers' claim that Danielle approached him "aggressively"[19] does not establish apprehension of harm. Additionally, Bowers stated that he touched Danielle's "upper chest," not her neck. VRP at 647. Instruction 17 defines "[s]trangulation" as "compress[ing] a person's neck," not their upper chest. CP at 155. Bowers cannot establish that he was entitled to a jury instruction justifying a touching of Danielle's neck when he did not even testify that he touched her neck. In sum, the trial court did not abuse its discretion in denying Bowers' proposed self-defense instruction.

V. AGGRESSOR JURY INSTRUCTION

Finally, Bowers asserts that we must reverse Bowers' conviction and remand for a new trial because the trial court included the aggressor jury instruction. Again, we disagree.

The jury was instructed the following:

> No person may, by any intentional act reasonably likely to provoke a belligerent response, create a necessity for acting in self-defense and thereupon use, offer, or attempt to use force upon or toward another person. Therefore, if you find beyond a reasonable doubt that the defendant was the aggressor, and that defendant's acts and conduct provoked or commenced the fight, then self-defense is not available as a defense.

---

[18] Bowers asserts in his reply that "[i]t is implicit in [ ] Bowers'[ ] testimony that his actions were necessary to protect himself from harm and that he anticipated harm would be inflicted on him by Danielle," and that "[i]t appears that the superior court simply misunderstood the trial testimony and did not understand how self-defense applied." Reply Br. at 11-12. We disagree. The trial court was entitled to believe, based on the totality of the evidence, that Bowers did not anticipate harm by Danielle, especially absent any statement to that effect by Bowers.

[19] VRP at 647.

CP at 153.

Bowers claims that this instruction was related to Callaway, not Bowers, and that it was "unnecessary and needlessly confused the jury regarding . . . self-defense" because "[t]here is no evidence indicating that Callaway threatened Fairbrother or attempted to assault him prior to Fairbrother wielding a knife and using it against Callaway." Br. of Appellant at 55-56. The State argues that Bowers has waived this issue because he did not object to this instruction below and does not, in his appellate brief, present argument as to why we should review this issue for the first time on appeal under RAP 2.5(a). Bowers did not address this argument in his reply, but rather stated that he "relies on previous briefing regarding the issues presented in this section." Reply Br. at 12.

If a party disagrees with the giving of a particular jury instruction it is imperative that they lodge an objection to the trial court so that the trial court may flesh out the issue and, in the very least, provide the appellate court with a record of why the party's objection did not prevail. Bowers deprived the trial court of the opportunity to consider the objection he now raises to this instruction. In the absence of even an attempt by Bowers to persuade us that review of this issue for the first time on appeal is warranted, we decline to review this issue. *Lindsey*, 177 Wn. App. at 247 (requiring a party to argue that a RAP 2.5(a) exception applies to avoid waiver).

## VI. CUMULATIVE ERROR

Bowers also argues that the cumulative error doctrine warrants reversal and remand for a new trial because the errors he alleged, in total, denied him the right to a fair trial. "[A] defendant may be entitled to a new trial when cumulative errors produce a trial that is fundamentally unfair." *State v. Emery*, 174 Wn.2d 741, 766, 278 P.3d 653 (2012). However, as we conclude that the trial

No. 60548-1-II

court did not err, the cumulative error doctrine does not apply. *State v. Clark*, 187 Wn.2d 641, 655, 389 P.3d 462 (2017).

CONCLUSION

Bowers fails to demonstrate error. We affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

CRUSER, J.

We concur:

GLASGOW J.

PRICE, A.C.J.